UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE JAMMER,

      Plaintiff,                   Civil Action No. 18-10445

        v.                  District Judge Linda V. Parker
                             Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  The parties have filed cross-motions for summary judgment.  Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #19] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

-1-

## PROCEDURAL HISTORY

On September 22, 2014, Plaintiff applied for DIB and SSI, alleging disability as of December 10, 2013 (Tr. 194, 197).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on March 14, 2017 in Mount Pleasant, Michigan (Tr. 36). John Loughlin, Administrative Law Judge ("ALJ") presided.  Plaintiff, represented by attorney Erika Riggs, testified (Tr.  43-63), as did Vocational Expert ("VE") Mary Everetts (Tr. 63-72).  On April 11, 2017, ALJ Loughlin found Plaintiff not disabled (Tr. 15-27).  On January 8, 2018, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed suit in this Court on February 7, 2018.

## BACKGROUND FACTS

Plaintiff, born December 2, 1967, was 49 when ALJ Loughlin issued his decision (Tr. 27, 194).   She completed 11th grade and worked as an assistant store manager, cashier/stocker, retail clerk, restaurant manager, and ice cream shop server (Tr. 220-221).  She alleges disability as a result of a cervical spine fusion, an aneurysm, memory problems, strokes, loss of extremity functioning, weakness/fatigue, and the need for a walking aid (Tr. 219).

### A.  Plaintiff's Testimony

Plaintiff's counsel prefaced her client's testimony by noting ongoing multilevel stenosis of the cervical spine following December, 2013 discectomy and fusion (Tr. 42).  She noted that in March, 2014, she was hospitalized for a right cerebral aneurysm requiring two

-2-

weeks of inpatient treatment and "significant rehab" (Tr. 42).  *She reported that five months*

*later, Plaintiff was diagnosed with a stroke and had since experienced migraine headaches,*

*complex headaches with loss of consciousness, weakness, falling, and "diffuse body pain"*

(Tr. 42).  *She noted that in July, 2016, Plaintiff underwent a stent replacement for the*

*aneurysm* (Tr. 42).

Plaintiff then offered the following testimony:

She lived in Bay City, Michigan (Tr. 43).  She stood 5' 7" and weighed 180 pounds

(Tr. 43).  She had not worked since December 10, 2013 (Tr. 43).  She was unable to work

due to severe headaches and leg weakness and numbness (Tr. 44).  She also experienced

shoulder and neck pain (Tr. 44).  She had also become more isolated after experiencing the

aneurysm due to depression (Tr. 44).

Plaintiff described the headaches as "pulsing," happening at unpredictable intervals,

and lasting up to three days (Tr. 45).  On one occasion, she sought emergency treatment for

a particularly bad headache (Tr. 45).  She coped with headaches by reclining, avoiding noise,

and being alone (Tr. 46).  She was able to stand for 20 minutes (with the use of a walker)

before feeling as if her legs were going to fall out from under her (Tr. 46).  She could stand

for 10 minutes without a walker (Tr. 47).  She could sit for up to 30 minutes (Tr. 47).  She

was unable to lift over five pounds (Tr. 47).

After the aneurysm she experienced memory and concentrational problems (Tr. 48).

She was physically unable to sit through an entire movie and lacked the cognitive ability to

follow the plot (Tr. 48).  She experienced lower back and shoulder pain washing dishes (Tr. 48).  She experienced medication side effects (Tr. 50).  She did not sleep more than four hours a night but typically took a two-hour nap during the day (Tr. 50).  She arose between 8:00 and 9:00 a.m., had coffee, watched the news, and showered (Tr. 51).  Her depression resulted in her indifference to hygiene at least 10 days a month (Tr. 51).  She was unable to carry a laundry basket and relied on her children to help her with the laundry chores (Tr. 52).  She had been admitted for psychiatric inpatient treatment on two occasions due to intense headaches (Tr. 53).  Plaintiff experienced left shoulder impingement six years before the hearing and the joints still "locked up" causing range of motion limitations (Tr. 54).  She spent approximately 80 percent of her day coping with the headaches (Tr. 55).

Between 2004 and 2007, she worked as a waitress (Tr. 62).  Between 2007 and 2008, she worked as the assistant manager of a dollar store (Tr. 57).  Subsequently, she  performed managerial and customer service work at an ice cream parlor (Tr. 60-61). Later, she worked as a cashier/stocker for another Dollar Tree store (Tr. 61).

### B.    Medical Evidence[1]

### 1.  Treating Sources

May, 2013 office records note the condition of anxiety, backache, and arthritis (Tr. 586).  Cervical spine tenderness was noted with no other abnormalities (Tr. 585).  In

---

[1]

Records unrelated to Plaintiff's contention that she medically equaled Listing 11.04B (Vascular Insult to the Brain), while reviewed in full, are omitted from the present discussion.

-4-

December, 2013, Plaintiff underwent a discectomy and fusion at C5-C6 and C6-C7 for disc herniations with radiculopathy (Tr. 377, 545). The following month, Plaintiff reported continued radiating pain despite the fusion surgery and steroid injections (Tr. 370). Imaging studies of the cervical spine were unremarkable (Tr. 368). The same month, Plaintiff denied medication side effects (Tr. 367). An MRI of the left shoulder from the next month showed tendinopathy with a small glenohumeral joint effusion (Tr. 365). March, 2014 records note good results from physical therapy and steroid injections (Tr. 531).

In April, 2014, Plaintiff reported headaches one week after her car was "T-boned" at an intersection (Tr. 1172). Imaging studies showed a small aneurysm (Tr. 319, 342, 348, 355, 1029, 1172). MRI and CT scans of the head following the April, 2014 craniotomy for "wrapping" of the aneurysm were essentially unremarkable (Tr. 323, 335, 357, 483, 1014, 1156). Plaintiff reported reduced pain and good sleep following the surgery (Tr. 328). She was able to walk with the use of a cane at the time of discharge (Tr. 326). The following week, Plaintiff was discharged by her pain management provider for failure to show up to appointments (Tr. 325). At the end of the same month, S. T. Chakravarthi, M.D. noted Plaintiff's report of intermittent headaches, one episode of right leg shaking, mild memory problems, seizures, and intermittent syncope (Tr. 316, 466). An EEG was normal (Tr. 465, 1191). Imaging studies were unremarkable (Tr. 316). She appeared "alert and cooperative" (Tr. 469). Treating notes from the following month note no neurological deficits (Tr. 1158).

A June, 2014 CT of the head (taken after Plaintiff bumped her head) was essentially unremarkable (Tr. 308, 436, 967, 974, 1234).  She denied nausea or dizziness, noting that temporary difficulty with speech had "cleared up" (Tr. 451).  She was prescribed Keppra "prophylactically" for possible seizures (Tr. 1154).  Treating records note that a recent EEG was negative for seizures (Tr. 1154).

An August, 2014 MRI of the brain (taken in response to reports of left-sided weakness) showed no acute process (Tr. 290-291, 297, 300-301, 422-433, 432).  Plaintiff was able to answer questions correctly and follow commands (Tr. 291, 427-428).  She exhibited full strength when making a "full effort" (Tr. 1228).  She exhibited a good range of motion and was fully oriented (Tr. 1151).  She was discharged three days later in stable condition (Tr. 285).  In October, 2014, Plaintiff sought emergency treatment for syncope (Tr. 273).  A November, 2014 CT of the head taken after Plaintiff reported dizziness, was normal (Tr. 939).  Plaintiff's reported neurological symptoms were deemed unrelated to the aneurysm repair (Tr. 920).  Plaintiff appeared fully oriented and had no trouble walking (Tr. 927, 1218).

November, 2014 treating records note that Plaintiff was referred for seven days of inpatient mental health treatment after seeking emergency treatment for headaches (Tr. 410, 596, 920).  Intake records note "a high risk for suicide" (Tr. 742).   She reported the symptoms of depressed mood, hopelessness, racing thoughts, sleep disturbances, and indifference to grooming (Tr. 596).  Plaintiff reported strengths as good personal attributes,

cooking and cleaning skills, and taking care of children (Tr. 596).  She was diagnosed with depression without psychotic features and a generalized anxiety disorder (Tr. 741).

February, 2015 hospital discharge records note Plaintiff's report of seizures, noting a history of "recurrent seizure related to noncompliance with medication" and that the seizures ceased when Plaintiff resumed her medication (Tr. 601, 603, 605, 617, 1121).  An EEG was negative for epileptic tendencies (Tr. 636).  An MRI was suspicious for a artery region aneurysm but was noted to be consistent with an August, 2014 study (Tr. 601, 631, 910- 911).  An April, 2015 CT of the head was unremarkable (Tr. 723, 878).  The following month, left shoulder arthroscopic surgery was performed without complications  (Tr. 707, 862).

In August, 2015, Plaintiff reported approximately two seizures a month lasting for "a few minutes" (Tr. 696).  She appeared alert and cooperative with a good memory (Tr. 697).  The report notes "some give-way weakness in the legs" but normal strength with "full effort" (Tr. 697).  The following month, Plaintiff was transported by a family member to the emergency room after stating that she wanted "to end it all" (Tr. 690, 834).  She was referred for inpatient treatment (Tr. 690).  Inpatient records note that she had "lots of pauses" between responses "apparently related to a [stroke]" (Tr. 681).  Plaintiff reported that she tried to cook, clean, shop, and pay bills and as a result, was exhausted by 7:00 p.m. (Tr. 681).  She reported that she had "a significant fight" with her partner at which time he asked her to leave (Tr. 681).  Treating records from the next month note no acute distress (Tr. 679).

In November, 2015, Amanda Schafer Johnson, Ph.D. opined that Plaintiff was "challenged" in terms of gainful employment "due to her neurological condition and cognitive functioning" and required "a structured and supported employment setting" (Tr. 677). She found that "multiple medications . . . could be further causing negative affect in cognition" (Tr. 677). She noted that repeat neuropsychological testing "is not necessarily warranted" (Tr. 677). Plaintiff exhibited "average to low average" recall and average recognition memory (Tr. 6 76). Dr. Schafer Johnson noted Plaintiff's report of a stroke in the summer of 2014 (Tr. 673). The same month, a CT of the head was unremarkable (Tr. 822).

December, 2015 sleep apnea studies were unremarkable (Tr. 812). February and March, 2016 CTs of the head were unremarkable (Tr. 789, 801). A March, 2016 MRI of the brain was unchanged from previous studies (Tr. 780). Khalil Nasrallah, M.D. opined that Plaintiff's reported memory loss was "secondary to vascular dementia due to her cerebral infarction," exacerbated by depression and anxiety (Tr. 1207). In June, 2016, an angiogram with coiling of the original aneurysm was performed (Tr. 753, 761, 1123). The following month, the carotid, cerebral, and vetebral arteries were catherized (Tr. 1078). Plaintiff reported that her headaches were "much better" after surgery (Tr. 1077). A July, 2016 CTA and August, 2016 CT of the head were normal (Tr. 772, 777). Plaintiff's continued headaches were attributed to Norco overuse (Tr. 763). A September, 2016 MRI of the lumbar spine was unremarkable (Tr. 752). May, 2016 records note that Plaintiff was alert

and fully oriented with fluent speech and full strength in the upper extremities and right lower extremity with 4/5 on the lower right extremity (Tr. 1142).

## 2. Non-Treating Sources

In February, 2015, Nancy Gardner, Psy.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report that she was still recovering from 2013 neck fusion surgery (Tr. 657). Plaintiff reported that following the April, 2014 discovery of the aneurysm, she went with her children to Florida to learn how to "walk and talk again" (Tr. 657). She reported that while she was in Florida, she had a stroke and now experienced headaches (Tr. 657). She noted that she had been released from the hospital the week before after experiencing seizures and that her hands shook "uncontrollably" (Tr. 657). She reported that she currently received counseling and got along well with her current partner (Tr. 658). She reported that she "trie[d]" to do arts and crafts (Tr. 658). On a typical day, she arose at 5:00 a.m., got her children ready for school, napped and spent her evenings playing games with her children and watching television (Tr. 659). She reported the need for a cane due to falling (Tr. 659).

Dr. Gardner noted that Plaintiff was fully oriented with a good memory but slowed responses (Tr. 660). She noted that Plaintiff's hands were shaky and that she experienced both depression and anxiety and required "additional time to think and process . . . information and provide an answer" (Tr. 661). She found that Plaintiff's prognosis was poor (Tr. 661).

The same month, Bruce G. Douglass, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff experienced mild restriction in activities of daily living, and moderate difficulty in social functioning and concentration, persistence, or pace (Tr. 92).

### C. Vocational Expert Testimony

VE Mary Everetts classified Plaintiff's past relevant work as an assistant manager, retail as skilled and exertionally light; cashier, unskilled/light; and manager, skilled/medium[2] (Tr. 66). ALJ Laughlin then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, work experience:

> [L]ight exertional level except the individual can frequently reach overhead with the left upper extremity. Let's assume that the individual can frequently kneel, crouch, stoop, balance and crawl, can frequently climb stairs and ramps, can never climb ladders, ropes and scaffolds and can never be exposed to vibrations, unprotected heights and moving machinery parts. Assume that the individual requires a moderated noise work environment as defined in the [*Dictionary of Occupational Titles* ("*DOT*") or [*Selected Characteristics of Occupations* ("*SCO*")]. In addition, assume that the individual is able to understand and remember simple instructions, make simple, work-related decisions, carry out simple instructions, can occasionally deal with changes in

---

2

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

-10-

a routine work setting and can occasionally deal with supervisors, coworkers and the public.  Also assume that the individual, in addition to normal scheduled breaks would require additional breaks resulting in the individual being five percent off task (Tr. 66).

The VE testified that the above limitations would preclude Plaintiff's past work but would allow for the exertionally light, unskilled work of general office clerk (211,000 positions in the national economy); housekeeper (439,000); and garment sorter (70,000) (Tr. 67).

 The ALJ posed a second question limiting the individual to *sedentary* work with a sit/stand option allowing a change of position every 20 minutes; need for a walker for ambulation; occasional kneeling, crouching, stooping, balancing, and crawling, stairs, and ramps; preclusion on ladders, ropes, scaffolds, vibrations, unprotected heights, and moving parts; and a "moderate noise" work environment (Tr. 67-68).  He limited the individual to understanding and remembering simple instructions, simple work-related decision, and carrying out simple tasks with occasional changes in a routine work setting and occasional interaction with coworkers, supervisors and the public with five percent of the time off task (Tr. 68).

The VE found that the second set of limitations would allow for a "limited number of sedentary jobs including surveillance system monitor (24,000) and inspector (12,000) (Tr. 69).  She found that if the second set of limitations were amended to allow the individual to be off task 15 percent of the day, or, be absent from work four or more days a month, all work would be precluded (Tr. 70).

-11-

**D.  The ALJ's Decision**

Citing the medical records, ALJ Loughlin found that Plaintiff experienced the severe impairments  of "status-post cervical fusion, degenerative joint disease of the left shoulder, hypertension, cerebral aneurysm staus-post repair, headaches, seizure disorder, major depressive disorder, bipolar I disorder, generalized anxiety disorder, and personality disorder" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17-18).

The ALJ rejected Plaintiff's contention that she met Listing 11.04 (Vascular Insult to the Brain), finding that Plaintiff had "never had a stroke or cerebrovascular accident" (Tr. 19).  He observed that "the effects of [the] cerebral aneurysm have not caused significant residual symptoms" contrary to Plaintiff's claim that she had extreme limitation in balancing (Tr. 19).  He noted elsewhere that while Plaintiff alleged a stroke in August, 2014, the treating records did not include mention of a stroke (Tr. 18).

The ALJ found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others;  concentrating, persisting, or maintaining pace; and in adopting or managing oneself (Tr. 19-20).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [S]he can frequently reach overhead with the left upper extremity.  She can frequently knee, crouch, stoop, balance, and crawl. The claimant can frequently climb stairs and ramps.  She can never climb ladders, ropes, or scaffolds.  She can never be exposed to vibrations, unprotected heights, and

moving machinery parts.  The claimant requires a moderate noise work environment, as defined by the [*DOT*] and [*SCO*].  She is able to understand and remember simple instructions, make simple work-related decisions, and carry out simple instructions.  She can occasionally deal with changes in a routine work setting.  She can occasionally deal with supervisors, coworkers, and the public.  In addition to normal scheduled breaks, she would require additional breaks resulting in her being five percent off task (Tr. 20).

Citing the VE's testimony, the ALJ found that Plaintiff could work as a general office clerk, housekeeper, and garment sorter (Tr. 26, 67).

 The ALJ discounted Plaintiff's professed degree of limitation, noting that she did not experience seizures while taking Keppra as directed by her treating sources (Tr. 22).  He cited November, 2014 records showing good strength and no neurological deficits (Tr. 22). He noted that the consultative neuropsychological evaluation performed in November, 2015 showed fluent speech, full orientation, and mental alertness (Tr. 22).  He noted that Plaintiff demonstrated an average memory with "[p]oor mental organization" (Tr. 22).  In regard to Plaintiff's report of continued headaches, the ALJ noted that she was advised to reduce the use of narcotics (Tr. 23).

As to the mental health conditions, the ALJ noted that Plaintiff was admitted for inpatient treatment which included "individual, group, and occupational therapy" (Tr. 23). He noted that while Plaintiff reported that she continued outpatient treatment, neither Plaintiff nor counsel had submitted any treating psychological records (Tr. 23).  He noted that a second inpatient stay occurred after Plaintiff had an argument with her partner about having to do "all of the household cooking, cleaning, shopping, and bill paying" (Tr. 23).

-13-

The ALJ found that the record did not support the ongoing need for the use of a cane (Tr. 24).  Despite her claims of left-sided weakness, he cited records showing full strength in all extremities (Tr. 24).  He noted "poor effort" during a neurological examination (Tr. 24).  He cited Dr. Chakravarthi's November, 2014 finding that the craniotomy was not causing the alleged symptoms (Tr. 24).  He accorded Dr. Gardner's finding of poor adaptive functioning "little weight" but accorded "significant weight" to Dr. Douglass' finding that Plaintiff was capable of unskilled work (Tr. 24).  He accorded "little weight" to Dr. Schafer's finding that Plaintiff needed a structured work environment, noting that it stood at odds with the her own clinical testing results (Tr. 25).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into

-14-

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir.1984)

## ANALYSIS

### A.  SSR 17-2p

In her original brief, Plaintiff argues that the ALJ erred by failing to obtain an expert medical opinion to support his finding that she did not medically equal Listing 11.04B (Vascular Insult to the Brain).  *Plaintiff's Brief,* 10-13, *Docket #16,* Pg ID 1305.  SSR 17-2p, 2017 WL 3928306, at *4 (March 27, 2017); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B. She cites SSR 17-2p which states that "[t]o demonstrate the required support of a finding that an individual is disabled based on medical equivalence at [Step Three], the record must contain one of the following:"

> 1. A prior administrative medical finding from an MC or PC from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or
>
> 2. ME evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or
>
> 3. A report from the AC's medical support staff supporting the medical equivalence finding.  *Id.* at *3.

Plaintiff argues that the ALJ's finding that she did not medically equal 11.04B is not supported by any of the above three sources.  *Plaintiff's Brief* at 11.  She argues further that the evidence supports the conclusion that she meets or medically equals the Listing.  *Id.* at 12-13.

-16-

In her own motion for summary judgment, Defendant agrees that SSR 17-2p is applicable to a finding of equivalency at Step Three but notes that Plaintiff's argument is based on a misunderstanding of the Ruling. She notes that Plaintiff's citation refers to the requirements for a *finding of disability* in contrast to the present case where the ALJ found that Plaintiff *did not* medically equal a listed impairment. *Defendant's Brief*, 5-6, *Docket #19,* Pg ID 1329.

Defendant is correct that under SSR 17-2p, an ALJ may find that a claimant does not medically equal a listed impairment without the support of a medical opinion:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment. SSR 17-2p at *4.

Plaintiff's argument appears to be based on a now rescinded Ruling. SSR 96-6p, in which a medical opinion was required on the issue of equivalency, "was rescinded and replaced by SSR 17-2p" which states that "the ALJ is not required to obtain medical expert evidence regarding equivalence . . . if the [he] 'believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment.'" *Holmes v. Commissioner of Social Security*, 2018 WL 3544902, at *3 (N.D.Ohio July 24, 2018); SSR 96-6p, 1996 WL 374180 (July 2, 1996); SSR 17-2p at *4. Therefore, the absence of a medical opinion on the issue of equivalency does not defeat the ALJ's Step Three findings.

**B.   A Preponderance of Evidence Supports the ALJ's Equivalency Finding**

In her response to Defendant's motion, Plaintiff does not dispute Defendant's contention that a medical expert was not required for the equivalency finding but argues, in effect, that the ALJ's finding that she did not meet Listing 11.04 was not "reasonable." *Id.* at *4. *Plaintiff's Response,* 2-3, *Docket #10,* Pg ID 1333.

Listing 11.04, in relevant part, requires a threshold finding of a "vascular insult to the brain" accompanied by

> B.   Disorganization of motor function in two extremities (see 11.00D1),resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult;[3]

---

[3]Listing 1100D1 describes "disorganization of motor function" as:
interference, due to your neurological disorder, with movement of two extremes; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity. All listings in this body system, except for 11.02 (Epilepsy), 11.10 (Amyotrophic lateral sclerosis), and 11.20 (Coma and persistent vegetative state), include criteria for disorganization or motor function that results in an extreme limitation in your ability to:
a. Stand up from a seated position; or
b. Balance while standing or walking; or
c. Use the upper extremities (including fingers, hands, arms, and shoulders).

Listing 11.00D2 describes "extreme limitation," in pertinent part, as:  the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).
a. Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use

or,

C. Marked limitation in physical functioning [] and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

1. Understanding, remembering, or applying information[]; or

2. Interacting with others[]; or

3. Concentrating, persisting, or maintaining pace [];

As an initial matter, Plaintiff's argument that the ALJ would not have discussed Listing 11.04 if he believed that the record did not "reasonably support" an equivalency finding is not well taken.  The ALJ made clear that he discussed Listing 11.04 because at the hearing,  counsel argued that Plaintiff met the Listing (Tr. 19, 72).  The fact that the ALJ addressed and rejected counsel's basis for a disability finding cannot be interpreted to state that he believed the record reasonably supported her claim.

Further, the ALJ's finding that Plaintiff did not meet or medically equal Listing 11.04 is  supported by a preponderance of the evidence and sufficiently articulated.[4]  SSR 17-2p

_____

of an assistive device, such as a walker, two crutches, or two canes.
b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive dvice, such as a walker, two crutches, or two canes.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00D2.

[4]

Under SSR 17-2p, the ALJ must base the equivalency finding on a preponderance of the evidence.  SSR 17-2p at *3.  As to articulation of the equivalency finding, SSR 17-2p states further that in general, "a statement that the individual's impairment(s) does not

at *3.  The ALJ stated that Plaintiff did not meet or medically equal any listed impairment and provided a discussion of the requirements of Listing 11.04 (Tr. 18 and 19).  As an initial matter, the Court disagrees with the ALJ's finding that she did not meet the threshold requirements of a vascular insult to the brain because she had not "had stroke or cerebrovascular accident" (Tr. 19).  In support of his finding, the ALJ noted that Plaintiff's allegations of a stroke to various health care providers were unsupported by the imaging studies (Tr. 23).  My own review of the 1000-page medical transcript likewise indicates that while Plaintiff repeatedly told various health care providers that she had experienced a stroke, the imaging studies and corresponding diagnoses belie her claim (Tr. 290-291, 297, 300-301, 422-423, 432, 1151, 1228).   However, the ALJ's finding that Plaintiff did not experience a vascular insult because she did not experience a stroke, without more, is insufficient to show the absence of a "vascular insult."  Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, a vascular insult to the brain "commonly" refers to stroke or cerebrovascular accident (CVA), but "a hemorrhage from a ruptured blood vessel or aneurysm in the brain" may also qualify as a vascular insult.  *Id.* As such, because an aneurysm can be used to demonstrate a vascular insult, the ALJ finding that Plaintiff did not experience a stroke does not eliminate the possibility that she otherwise met the threshold requirement of Listing 11.04.

---

medically equal a listed impairment constitutes sufficient articulation for this finding. *Id.* at *4.  "An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at [Step Three]." *Id.*

Nonetheless, the question of whether Plaintiff met the threshold requirement of Listing 11.04 is of no import given that a preponderance of the evidence supports the finding that she does not meet  or equal the Listing's B or C criteria.  As to the B criteria, the ALJ noted that the treating records (normal gait, ability to walk unaided, full muscle strength) defeated Plaintiff's claim of extreme limitation in balancing, standing, or walking (Tr. 19); *see* Listing 11.00D2, fn 4, *above.*  Regarding the C criteria, Plaintiff has not challenged the ALJ finding that she experienced only moderate limitation in understanding, remembering, or applying information, interacting with others, and in concentrating, persisting, or maintaining pace (Tr. 19).  Without more, Plaintiff's failure to challenge the ALJ's finding of only moderate limitation in all of these areas is fatal to the claim that she meets or medically equals Listing 11.04C.

The ALJ noted that the records created subsequent to the April, 2014 craniotomy did not support a finding of disability, citing observations of good strength, no neurological deficits, fluent speech, and memory skills within normal limits (Tr. 22).  He cited treating reports attributing Plaintiff's headaches to the overuse of narcotics rather than a neurological defect (Tr. 23).  He observed that none of the records supported Plaintiff's report to mental health sources that she had to learn how to "walk and talk again" after a stroke, noting that none of the records showed a stroke or that she was ever unable to walk or talk (Tr. 23).

The discrepancies between Plaintiff's testimony and her reports to certain medical sources also undermine her claims of limitation.  While Plaintiff testified that she performed

minimal household chores and could not follow movie plots (Tr. 52), she reported to Dr. Gardner that she arose early, prepared her children for school, and spent the evenings playing games with her children and watching television (Tr. 659). September, 2015 treating records state that she fought with her husband because she performed a disproportionate share of the household chores, finances, and shopping (Tr. 681). While Plaintiff cites her August, 2014 allegations of left side weakness, *Plaintiff's Brief* at 12, treating records show normal strength while making a "full effort" (Tr. 1228). As discussed above, Plaintiff's report of stroke-like symptoms or complications arising from the April, 2014 aneurysm repair stand at odds with imaging studies and clinical observations showing no cognitive loss, a good range of motion and full orientation (Tr. 291, 427-428, 432, 1151). Notably, in November, 2014, Plaintiff's alleged neurological symptoms were deemed unrelated to the aneurysm repair or any recognizable neurological condition (Tr. 920). Records from the same month note that she appeared fully oriented and had no trouble walking (Tr. 927, 1218). Because the ALJ's finding that Plaintiff did not equal a listed impairment is well supported and explained, a remand is not warranted.

In closing, I note that the record indicates that Plaintiff experiences some degree of physical and mental limitation. Thus, the recommendation to uphold the ALJ's findings should not be read to trivialize her legitimate health concerns. However, because the determination that she was not disabled is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen*

*v. Bowen*, *supra*.

## **CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #19] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #16] be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen<br>
R. STEVEN WHALEN<br>
UNITED STATES MAGISTRATE JUDGE

Dated: February 22, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 22, 2019, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla<br>
Case Manager to the<br>
Honorable R. Steven Whalen